E-FILED
Thursday, 15 November, 2012  03:57:02 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| **NECA-IBEW WELFARE TRUST FUND, and** | ) | |
| **NECA-IBEW PENSION TRUST FUND** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 10-CV-2046** |
| **v.** | ) | |
| | ) | |
| **ERNIE'S ELECTRIC CO, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

This case is before the court on a Motion for Summary Judgment [23] filed by Plaintiffs, NECA-IBEW Welfare Trust Fund, and NECA-IBEW Pension Trust Fund.  Following this court's careful consideration of the arguments of the parties and the exhibits provided by the parties, Plaintiffs' Motion for Summary Judgment [23] is GRANTED in part and DENIED in part.

## JURISDICTION

Plaintiffs, the Pension Fund and the Welfare Fund, are employee benefit plans administered pursuant to the terms and provisions of the Agreements and Declarations of Trust creating the Funds and are required to be maintained and administered in accordance with the provisions of the Labor Management Relations Act (LMRA) and the Employee Retirement Income Security Act (ERISA). Plaintiffs have standing to bring this action pursuant to ERISA to recover delinquent contributions to the Pension Fund and Welfare Fund, which were required by written agreements enforceable against Defendant. 29 U.S.C. § 1145. This court has subject-

matter jurisdiction pursuant to ERISA as a collection action, 28 U.S.C. §§ 1132(a)(3) and

1132(3).


# BACKGROUND[1]

## Facts

On April 6, 1976, Ernest Miller, the then-President of Defendant Ernie's Electric Co, and

father to Samuel Miller ("Miller Sr."), signed a Letter of Assent "A" authorizing the North

Central Indiana Chapter of NECA, Inc. to be its collective bargaining representative for all

matters contained in or pertaining to the current approved Inside Labor Agreement. The

substance of that agreement stated, in its entirety:

> In signing this letter of assent, the undersigned firm does hereby authorize the
> North Central Indiana Chapter of NECA, Inc., as its collective bargaining
> representative for all matters contained in or pertaining to the current
> approved inside labor agreement between the North Central Indiana Chapter,
> NECA, Inc., and Local Union 725, IBEW. This authorization, in compliance
> with the current approved labor agreement, shall become effective on the 1st
> day of January, 1976. It shall remain in effect until terminated by the
> undersigned employer giving written notice to the North Central Indiana
> Chapter, NECA, Inc., and the Local Union at least one hundred fifty (150)
> days prior to the then current anniversary date of the aforementioned approved
> labor agreement.

On March 20, 2006, Defendant sent notice to the Cedar North Central Indiana Chapter

NECA, Inc., and IBEW Local Union 725 that effective December 1, 2006, NECA would no

longer represent Defendant for the purpose of collective bargaining concerning the "Inside Labor

Agreement, or any other collective bargaining agreement, or for any other purpose." (#25, Exh.

6).

---

[1] The facts are taken from Defendant's statement of undisputed material facts, Plaintiffs' statement of
additional material facts, and the documents submitted by the parties. This court has only included facts it
has concluded are material and adequately supported by evidence in the record.

On April 7, 2006, an election by secret ballot was held before the National Labor Relations Board. On April 13, 2006, Defendant filed timely objections to the election. Following an investigation, report, and hearing, on June 1, 2006, Defendant withdrew its objections. On June 6, 2006, IBEW Local Union 725 converted its existing Section 8(f) labor agreement with Defendant into a Section 9(a) agreement and the NLRB recognized Local 725 as the collective bargaining representative for Defendant's bargaining unit employees.

On August 28, 2006, Local 725 sent a letter to Defendant, requesting a change to the agreement. (#25, Exh. 8). Both parties agree that the Inside Agreement required that any unresolved issues or disputes arising out of the failure to negotiate a renewal or modification to the agreement were to be submitted to the Council on Industrial Relations for the Electrical Contracting Industry ("CIR") for adjudication. On October 17, 2006, the CIR sent Defendant and Local 725 a notice of hearing and requested briefs. (#25, Exh. 9). On October 23, 2006, Local 725 requested an arbitration meeting before the CIR. (#25, Exh. 10).

On November 3, 2006, Defendant sent Local 725 a letter revoking its recognition of the union as its collective bargaining agent and rescinding any and all collective bargaining agreements, claiming that because it had only one employee in the bargaining unit that it was not an employer pursuant to the National Labor Relations Act ("NLRA") for the purpose of collective bargaining. (#25, Exh. 11). On November 6, 2006, Defendant's attorney sent a letter to the CIR indicating that Defendant's position was that because Defendant had a stable one-person workforce for several months, it was no longer subject to the jurisdiction of the NLRA and therefore there was no contractual relationship giving the CIR jurisdiction over Defendant. (#26, Exh. 12). On November 6, 2006, the CIR responded to Defendant, indicating that the issues were governed by contract law, not the NLRA. (#26, Exh. 13).

The first Inside Agreement was valid between December 1, 2004 and November 30, 2006, and would renew annually *ad perpetuum* unless changed or terminated pursuant to the agreement. (#26, Exh. 14). In order to change or terminate the agreement, the contract required that written notification be given at least 90 days before the expiration date or any anniversary date occurring thereafter.

On November 13, 2006, the CIR held an arbitration hearing. Defendant did not appear at the hearing. After considering the evidence, the CIR ruled in favor of Local 725 and awarded Local 725 a new Inside Agreement. Defendant did not sign the new Inside Agreement. (#26, Exh. 15). In his deposition, Defendant admitted that its position was that "it considered Ernie's Electric to be a new company that had yet to negotiate a collective bargaining agreement, and none was ever negotiated between the union and the new company. Consequently, there was no agreement between the union and the company and therefore no relationship with the funds to be governed by a collective bargaining agreement." (Deposition of Samuel A. Miller, Sr., #25 at 61:2-11) (hereinafter "Dep."). Further, Defendant admitted that its position was that it was not bound by the CIR's arbitration decision because he "was advised by [his] attorney that that didn't apply to [him]." (Dep. 64:20-21).

On May 11, 2007, Local 725 filed a complaint in the District Court for the Southern District of Illinois, seeking to enforce the arbitration award. (#26, Exh. 16). On July 13, 2007, a summons was issued for Miller Sr. in the Southern District of Indiana, which was returned on August 23, 2007, having been served personally on him at his desk. *International Brotherhood of Electrical Workers Local Union No 725 v. Ernie's Electric Company Inc*., 07-CV-00104 (S.D. Ind. Sept. 18, 2007). Defendant did not appear at the judicial proceeding. Local 725 filed a motion for default judgment on September 18, 2007, which the Clerk of the Court entered on

September 19, 2007, noting that Defendant had failed to respond to the complaint. Copies were

sent to both parties. On March 4, 2008, a damages hearing was held at that court. The court noted

in a minute entry that Defendant did not appear there either, and therefore entered default

judgment against Defendant. That order stated, in its entirety:

> The Defendant, Ernie's Electric Company, Inc., having failed to plead or
> otherwise defend in this action, and its default having been entered, now,
> following a hearing on damages conducted on March 4, 2008, is hereby
> ORDERED, ADJUDGED AND DECREED that the November 13, 2006
> decision from the Council on Industrial Relations for the Electrical
> Contracting Industry is confirmed, and that Ernie's Electrical Company, Inc
> must implement all terms and conditions of that decision retroactive to
> December 1, 2006.

(#26, Exh. 17). Again, copies of the order were sent to both parties.

On March 25, 1975, Ernest Miller signed a Letter of Assent "A" pertaining to Residential

Labor Agreement on behalf of Defendant. The substance of that agreement stated, in its entirety:

> In signing this letter of assent, the undersigned firm does hereby authorize the
> North Central Indiana Chapter of NECA, Inc., as its collective bargaining
> representative for all matters contained in or pertaining to the current
> approved Residential labor agreement between the North Central Indiana
> Chapter, NECA, Inc., and Local Union 725, IBEW. This authorization, in
> compliance with the current approved labor agreement, shall become effective
> on the 1st day of December, 1974. It shall remain in effect until terminated by
> the undersigned employer giving written notice to the North Central Indiana
> Chapter, NECA, Inc., and the Local Union at least one hundred fifty (150)
> days prior to the then current anniversary date of the aforementioned approved
> labor agreement.

(#25, Exh. 2). A Residential Agreement was executed between Local 725 and NECA for

the period between June 1, 2006 through May 31, 2008. (#26, Exh. 18). To terminate the

Residential Agreement, either party was required to provide written notification to the other

party at least 90 days prior to expiration of the Agreement or any anniversary date occurring thereafter.[2]

An accounting firm conducted a payroll examination of Defendant and found that Defendant currently owes contributions of $25,518.81 to the NECA-IBEW Pension Trust Fund. The same firm also found that Defendant owes contributions of $43,418.57 to the NECA-IBEW Welfare Trust Fund. Defendant does not contest the amounts stated in those payroll registers, but contests whether contributions for certain employees were required to the Fund for the entire audited period. Miller Sr. disputes that he owes payments for himself and his two sons, who are Samuel A. Miller, Jr. and Matthew Miller, but admits that he is liable for contributions for all the rest of his employees on the audit (Dep. 37:4-38:8).

### Procedural History

On March 5, 2010, Plaintiffs filed their complaint in this court. On June 1, 2010, Plaintiffs filed an amended complaint, stating that the action was brought pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), as amended, 29 U.S.C. § 1145, and the Labor Management Relations Act of 1947 (LMRA), as amended, 29 U.S.C. § 185(a). On

---

[2] There were two other alleged Letters of Assent. The first purportedly authorizes Local 725 as Defendant's collective bargaining representative for all matters contained in or pertaining to the Communications Labor Agreement between NECA and Local 725. (#25, Exh. 3). In his deposition, Miller Sr. contests the authenticity of his father's signature on that document, asserting that his father had severe Alzheimer's at the purported time of signing in 1986, and would have been neither mentally nor physically able to sign. Also, Plaintiffs did not provide a copy of any Communications Labor Agreement, and further do not reference it in substance in their arguments.

The second alleged Letter of Assent is one between Defendant and the Central Indiana NECA, authorizing NECA as its collective bargaining representative for the Inside labor agreement between the Muncie-Richmond Central Indiana NECA and Local Union 855, IBEW. Plaintiffs neither include the referenced inside labor agreement, nor do they discuss this document in their argument. This court is unsure why it was included as an exhibit and discussed during the deposition. (#25, Exh. 5). Neither document is pertinent to the present analysis.

June 24, 2010, Miller Sr., as president of the Defendant corporation, personally filed a letter with

the court on behalf of Defendant. In it, he alleged, in pertinent part:

> It is not my intention to harm the union or its members, however it is my civil right to work in the electrical trade as a non-participant in the union and I claim my right to do so as guaranteed in the Constitution of the United States.
>
> As a non participant in the union it is unfair to demand Heath and Welfare payment with out the coverage the payment would provide.
>
> I question the legitimacy of the three CBA provided in the lawsuit, and request to see the original ink signature supplied by plaintiff's attorney in this civil action.
>
> The to attorneys that Ernie's Electric hired to represent the Corporation, WESSELS & PAUTSCH, OGLETREE DEAKINS both agreed that as of November 3,2006 Ernie's had revoked the CBA and representation of Local 725 because it "has had a stable one-person workforce . which takes the Company out of the jurisdiction of the National Labor Relations Act. Therefore, there is no contractual relationship that would give the { Council } jurisdiction ever Ernie's and therefore can not be subject to CIR rule. Even after not meeting legal requirements Local 725 is still trying to bound Ernie's by their agreement. Todd Thacker, Business agent for Local 725 and Dwayne Miller at the time an employee of Ernie's Electric came into my business and told that they were putting me out of business, after the meeting Todd Thacker removed its five apprentice from Ernie's telling them to report back to the hall the next mourning, one of the apprentice being my son Samuel Miller JR. so I was left with no option but to draft a letter stating I no longer wish to be represented.

(#7) (all text *sic erat scriptum*). Magistrate Judge David G. Bernthal held two hearings, the first

on July 29, 2010 and the second on September 13, 2010. On September 30, 2010, an appearance

was made by Joseph McMahon on behalf of Defendant (#11). Judge Bernthal struck the letter on

October 5, 2010. Discovery began on October 21, 2010 (#14). Richard Williams appeared on

behalf of Defendant on January 14, 2010 (#17). Michael Einterz appeared on behalf of

Defendant on June 24, 2011 (#21).

On April 2, 2012, Plaintiffs filed the present Motion for Summary Judgment (#23-28).

Defendant filed their response on April 23, 2012 (#29-30.) Plaintiffs filed their reply on May 7,

2012 (#31). As the matter is fully briefed, this court is ready to rule on the Motion for Summary

Judgment (#23).


## ANALYSIS

There are two issues here. The first is in regard to the governing law. Is the claim based

in and therefore enforceable under the rubric of ERISA, NLRA, or contract law?[3] Second,

presuming that some operable channel for liability exists, for which employee(s), if any, was

Defendant required to provide contributions to the pension and welfare funds? More specifically,

there are two relevant groups of employees. The first consists of Miller Sr., Sam Miller Jr.

("Miller Jr.") and Matthew Miller (hereinafter "Family Employees"). Miller Jr. and Matthew

Miller are Miller Sr.'s sons. The second group consists of all Defendant's other employees

during the relevant period (hereinafter "Other Employees"). (#29, p.5). Both parties agree that

the relevant period in dispute is between January 1, 2005 through September 30, 2007

(hereinafter "Audit Period"). (#29, ¶ 52).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986). In ruling on a motion for summary judgment, a district court "has one task and one task

only: to decide, based on the evidence of record, whether there is any material dispute of fact that

requires a trial." *Waldridge v. Am. Hoechst Corp*., 24 F.3d 918, 920 (7th Cir. 1994). In making

this determination, the court must construe the evidence in the light most favorable to the

---

[3] Although Defendant at one point concedes that the asserted CBAs were in force and effect during the
relevant period, (#29, p.5) because Defendant argues in its Response that ERISA law is not controlling,
(#29, p.10), an analysis is required to demonstrate why the CBAs control rather than ERISA.

nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986*); Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). As will be discussed, there are no facts in dispute; rather, the only real question is whether the Family Employees must be treated as "employees" for the purpose of the Welfare and Pension Funds.

## I. Cause of action and statutory framework

The first question is which legal framework must be applied to Plaintiff's claim. Plaintiffs argue in their motion for summary judgment only that it is "an ERISA collection action pursuant to 29 U.S.C. § 1145," and fail to apply that statement to the facts in the present case regarding the Inside and Residential Agreements. Defendant argues, in its response, that because 1) Plaintiff brought their action under ERISA; 2) an insurance coverage plan covering only a sole business owner and his or her immediate family members cannot qualify as an employee welfare benefit plan covered by ERISA; and 3) the plans in effect for the period after August 1, 2006 only covered the business owner and Family Employees, that Plaintiff's sole ERISA claim necessarily fails. Plaintiffs reply that the claims are based in contract law, rather than labor law, and therefore, the definitions and procedures in ERISA are irrelevant.

This court agrees with Plaintiffs. As deployed here, Plaintiffs do not use ERISA to cover the substance of employee benefit plans, but rather to provide a federal cause of action to enforce the terms of contractually-agreed-upon employee benefit plans. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003) ("In contrast to the obligatory, nationwide Social Security program, nothing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a

plan.") (editing marks omitted); *Lockheed Corp. v. Spink*, 517 U.S. 882, 887, 116 S. Ct. 1783, 1788, 135 L. Ed. 2d 153 (1996) ("ERISA does, however, seek to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits.") (editing marks omitted).

Here, ERISA affords Plaintiffs a federal cause of action in 29 U.S.C. § 1145 ("Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.") and federal court subject-matter jurisdiction in 29 U.S.C. § 1132(e)(1) ("Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, fiduciary, or any person referred to in section 1021 (f)(1) of this title."). *See also Cent. States, Se. & Sw. Areas Pension Fund v. Schilli Corp.*, 420 F.3d 663, 670 (7th Cir. 2005) ("[ERISA] authorizes multiemployer plans to sue for delinquent contributions owed under the terms of the plan or under the terms of a collectively bargained agreement.") (quotation marks omitted); *Cent. States, Se. & Sw. Areas Pension Fund v. Kroger Co.*, 73 F.3d 727, 730-31 (7th Cir. 1996) ("Section 515 [aka 29 U.S.C. § 1145] gives pension funds… the right to enforce the writings according to their terms.") (editing marks omitted.)

The Circuit Courts of Appeal have broadly interpreted 29 U.S.C. § 1145 "as precluding employers from raising a variety of contract defenses as a means of avoiding the obligation to contribute to employee benefit plans." *Agathos v. Starlite Motel*, 977 F.2d 1500, 1505 (3d Cir. 1992). The *Agathos* court noted that, at the time, there were only three recognized defenses: 1) that the pension contributions themselves are illegal; 2) the collective bargaining agreement is

void *ab initio,* as where there is fraud in the execution, and not merely voidable, as in the case of

fraudulent inducement; and 3) the employees have voted to decertify the union as its bargaining

representative, thus prospectively voiding the union's collective bargaining agreement. *Id.*

Defendant has not raised any of these exceptions, and it is clear that none applies here.

Moreover, Section 1145 "gives a multiemployer plan greater rights under these documents than

the union itself, entitling a plan to enforce the writing without regard to understandings or

defenses applicable to the original parties." *Cent. States, Se. & Sw. Areas Pension Fund v. Schilli*

*Corp.*, 420 F.3d 663, 670 (7th Cir. 2005) (editing marks omitted).

Plaintiffs' suit is an action to enforce the terms of the Inside and Residential collective

bargaining agreements. *See Moriarty v. Larry G. Lewis Funeral Directors Ltd.*, 150 F.3d 773,

776 (7th Cir. 1998). In *Moriarty*, pension and welfare funds that accepted contributions from a

funeral director corporation pursuant to a CBA with a multi-employer association representing

the funeral directors filed an action when the funeral directors failed to remit contributions on

behalf of any other employee. There, the funds sued, demanding access to the corporate books

and any additional contributions warranted following an audit. The Seventh Circuit held that the

federal courts had jurisdiction over the claim because the claim was not a collection pursuant to

ERISA, but rather, was based on contract law rather than principles of labor law seeing as "no

employee wants to change bargaining representatives (or decertify a union); no one contends that

an unfair labor practice has been committed." *Id*. at 775-76. *See Buckley Dement, Inc. v.*

*Travelers Plan Administrators of Illinois, Inc.*, 39 F.3d 784, 789 (7th Cir. 1994) ("in interpreting

ERISA plans, we have utilized a federal common law of contract interpretation rather than

relegating such interpretative matters to the law of the individual states."); *Bellas v. CBS, Inc.*,

221 F.3d 517, 522 (3d Cir. 2000) ("this court is required to enforce the Plan as written unless it

can find a provision of ERISA that contains a contrary directive.") (editing marks omitted).

Thus, while this court has subject-matter jurisdiction pursuant to ERISA and Plaintiff's cause of

action is afforded by ERISA, the appropriate analysis is contract interpretation rather than

ERISA or labor law.

Next, the operative contracts were binding on Defendants. Defendant was initially bound

to the CBAs via agency law. When Defendant authorized NECA as its collective bargaining

representative for matters pertaining to the Inside Labor Agreement in the 1976 Letter of Assent

"A", Defendant agreed that NECA would negotiate with Local 725 on its behalf. Under agency

law, these negotiations bound Defendant to the terms of the CBAs, which had been and would

continue to be negotiated and executed between NECA and Local 725. The Letter of Assent "A"

incorporated the "current approved" labor agreement into the letter of assent and bound

Defendant to the terms of the Inside Agreement. *See McDonald v. Hamilton Elec., Inc. of*

*Florida*, 666 F.2d 509, 513 (11th Cir. 1982) ("By executing these letters of assent, appellant

agreed to be bound by any matter contained in the extant collective bargaining agreements as

well as any changes negotiated by the [bargaining representative] pertaining to or amending the

agreements."); *cf. Int'l Broth. of Elec. Workers, Local 532 v. Brink Const. Co.*, 825 F.2d 207,

214 (9th Cir. 1987) (holding that after an employer revoked its letter of assent with its collective

bargaining representative, the representative could no longer, at that point, commit the employer

into subsequently-negotiated agreements).[4] The same reasoning applies to the 1975 Residential

CBA and the Residential Labor Agreement.

---

[4] There is an interesting discrepancy between the terms of the "Letter of Assent 'A'" signed in 1976 regarding the Inside Labor Agreement and Local 725, and the "Letter of Assent 'A'" signed in 2000 regarding the Inside Labor Agreement and Local 855. The more recent agreement specifically requires that "the undersigned firm agrees to comply with, and be bound by, all of the provisions contained in said current and subsequent approved labor agreements." (#25, Exh. 5). This language is conspicuously missing from the 1976 agreement. (#25, Exh. 1-2). However, this discrepancy has no impact on the

Defendant notified NECA on March 27, 2006 that it was revoking its authorization of NECA as its collective bargaining representative pertaining to the inside labor agreement.[5] (#25, Exh. 6). While that act was timely and therefore terminated the relationship with NECA, it did not, however, terminate the agreement with Local 725, and, by relation, did not terminate its duties to the Plaintiffs Trust Funds. The Inside Agreement was valid until November 30, 2006. Defendant was required pursuant to § 1.02(a) of the Inside Agreement to provide written notification at least 90 days prior to the expiration of the Agreement, but did not do so timely, instead waiting until November 3, 2006 to do so.[6] On August 28, 2006, Local 725, pursuant to § 1.02(d) of the Inside Agreement, notified Defendant that it sought to renegotiate the terms of the agreement. On October 23, 2006, due to stalled negotiations, Local 725 notified Defendant that it had submitted the dispute to the CIR for arbitration. Defendant failed to appear at and failed to present any arguments at the CIR arbitration hearing. Accordingly, the CIR ruled that "the parties are directed to sign and implement immediately the Inside Agreement which is attached hereto and hereby made a part of this decision." (#26, Exh. 15). An Inside Agreement between Defendant and Local 725 was filed this court, signed by the business manager for Local 725 but

---

outcome; the *McDonald* court treated two letters of assent reflecting the same discrepancy as identical as regard to their power to bind a signatory. *McDonald v. Hamilton Elec., Inc. of Florida*, 666 F.2d 509, 512-13 (11th Cir. 1982).

[5] The termination notice also indicates, in its final paragraph: "Therefore... NECA, Inc will no longer represent [Defendant] for the purpose of collective bargaining concerning the Terre Haute Division, Indiana Chapter, Inside Labor Agreement, *or any other collective bargaining agreement*, or for any other purpose." (emphasis added). The boilerplate language is ambiguous as to whether it includes the Residential agreement. In his deposition, when asked whether "this letter is meant to terminate NECA as your bargaining representative," Miller Sr. responded "Correct, yes." When asked in follow-up that "It doesn't terminate any agreements other than the letter of assent that assigns NECA as your bargaining representative," Miller Sr. responded "Yes." (Dep. 21:11-17). Thus, in neither the deposition nor in the brief, do the parties address whether it was the intent or understanding that the revocation was valid for both the Inside agreement and the Residential agreement, or just the Inside agreement.

[6] Defendants assert in this letter that it has only one employee in the bargaining unit and therefore is not an employer under the NLRA for the purpose of collective bargaining. Notably, this doctrine only applies to NLRA actions, and does not apply to delinquent ERISA contribution claims, as will be discussed *infra*.

not countersigned. (#26, Exh. 15). On May 11, 2007, Local 725 filed an action in the U.S.

District Court for the Southern District of Indiana to enforce the arbitration award. (#26, Exh.

16). Defendant again failed to appear, plead, or otherwise defend in the enforcement action, and

thus, on March 4, 2008, that court ordered that Defendant "must implement all terms and

conditions of the... [November 13, 2006 decision issued by the CIR] retroactive to December 1,

2006. " (#26, Exh. 17). Therefore, at least one version of the Inside Labor Agreement was in

effect and binding for the period starting from the execution of the agreement between NECA

and Local 725 in 1976, through the expiration of the one awarded by the CIR, which occurred on

November 30, 2008.[7]

---

[7] Some note must be made as to why Defendant took what appears in hindsight to be several ill-advised and prejudicial actions. The following three exchanges were taken from Miller Sr.'s deposition.

> Q (Plaintiffs): Let me show you what's marked as Exhibit 17. Can you tell me what that is? [Referring to the default judgment issued by the District Court for the Southern District of Indiana, enforcing the CIR's arbitration decision]
> A (Miller Sr.): It's a default judgment to come and subpoena my records.
>
> (Dep. 33:18-21).
>
> Q. And did Ernie's Electric Company, Inc. appear in this case?
> A. No. The only thing that I ever got a letter from them was exactly what I just told you, was stating these people need to come in and they need to see your payroll.
>
> Q. Who is "them"?
> A. The federal judge is them.
>
> Q. Okay.
> A. I never got a letter saying you need to adhere to the CIR ruling, no.
>
> Q. Okay. You did get this document, though, correct?
> A. If you're saying that that's what it says, no. The only letter I ever got from one of the federal judges was saying let those people come in and see your payroll records.
>
> (Dep. 34:20-35:11).
>
> Q: Let me show you what is marked as Exhibit No. 11. Can you tell me what that is?
> A: This was my -- basically my rebuttal to the things that you've been going through from the CIR because my attorney advised me that I'm not subject to the CIR unless I have more three working employees.

- 14 -

Plaintiffs argue, prospectively, in its Motion for Summary Judgment, that Defendant cannot claim to have repudiated the CBAs under the one-man unit rule, perhaps in response to earlier arguments. Notably, Defendant does not take this position in its Response. In an overabundance of caution, this court will address the one-man unit rule argument. This court agrees with Plaintiffs. A National Labor Review Board "finding that the one-man rule barred a remedy under the NLRA did not resolve the issue of a potential remedy under ERISA. Defenses to the validity of a labor contract and liability under ERISA's section 515 present distinct issues." *Martin v. Garman Const. Co.*, 945 F.2d 1000, 1004 (7th Cir. 1991). "The one-man rule may remain valid for purposes of unfair labor practice proceedings while counting for naught when the contract is cognizable under ERISA." *Id.* at 1005.

Accordingly, because Defendant was bound by the terms of the Inside Agreement (which it does not dispute), and because the only impact of ERISA is that it requires employers to comply with the terms of the contracts (and provides subject-matter jurisdiction to this court), Defendant was contractually required to contribute to the pension and welfare funds during the relevant times.


## II. Employees covered by the CBAs

*A. Other Employees*

Defendant effectively does not contest that it owes unpaid contributions for the non-family employees for the relevant period. In his deposition, Miller Sr. made the following statements:

> Q (Plaintiffs): So with regards to everybody else listed in the report, there is no
>     dispute in terms of the auditor's calculation? What they did was they took

(Dep. 26:23-27:2).

the monthly payroll reports that you submitted [...] and they compared those
to your payroll records?

A (Defendant): Yes, I understand that, but that's exactly what I got up and said
in federal court.

Q: What's that?

A: Anybody on those sheets that I owe money, I will pay it other than me and
my two sons. That's exactly what I said.

(Dep. 47:19-48:7)

Q: If you indicate you're willing to pay for these guys except for your family,
why would you agree to that if you haven't verified this with your
accountant?

A: It's not that I think it's wrong. I'm just saying that I'm willing to pay for it
if it's actually owed.

(Dep. 50:8-14).

The content of the payroll registers is undisputed [by Defendant], but also
immaterial in this matter. The question before this Court is not whether
Ernie's employed certain individuals or reported certain amounts, but whether
every individual employed by Ernie's is required to contribute to the Funds
for the entire Audit Period. The fact that certain individuals show up as
employees does not affect this Court's determination of what contributions, if
any, should have been made by Ernie's.

(#29, p.5).

Although Defendant only obliquely admits liability for the Other Employees,

Defendant's Response also does not present any legal argument regarding why it is not liable for

contributions for the Other Employees. Furthermore, Defendant does not dispute that all the

Other Employees on the payroll audit are electrician employees. Nor does Defendant challenge

the authenticity or veracity of the audited payroll statements provided by Plaintiffs regarding the

purportedly unpaid contributions on behalf of the Other Employees. Accordingly, even though

this court must construe all the evidence in the light most favorable to Defendants and draw all

reasonable inferences in favor of Defendants, because Plaintiffs did provide evidence, and Defendant did not, this court must conclude on summary judgment that Defendant was required to contribute for the Other Employees the amounts listed in the audit, but failed to do so.

### B. Family Employees

As discussed, the Inside Agreement is binding on Defendant. Further, Defendant does not contest the payroll registers or the amounts alleged to be owed pursuant to them. If no relevant legal exception applies, it must be presumed that Defendant was required to comply with the terms of the agreement for all the covered individuals, and, failing to do so, owes the amount in the audit. In the previous section, this opinion concluded that Defendant is liable for the amount listed in the audit for the Other Employees. In this section, the core issue is the parties' different interpretation of the words "employee" and "work", as only hours "worked" count for contributions to the Welfare Fund, and only hours "worked" by "employees" count for contributions to the Pension Fund.

The characterization of the Family Employees as "employees" under the terms of the CBAs is a matter of interpretation of the plan itself. This term is not defined in CBAs. Consequently, the analysis must look to the federal law of contracts to guide its analysis. This court is required to interpret collective bargaining agreements in the same way as other contracts, with the caveat that they are interpreted under federal law. *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 405 (7th Cir. 2002); *Cent. States, Se. & Sw. Areas Pension Fund v. Kroger Co.*, 73 F.3d 727, 730-31 (7th Cir. 1996) ("When considering a contract in the context of an ERISA claim, federal common law rules of interpretation apply.").

The starting point in this inquiry is the language of the Agreements. In the 2004-2006 Inside Agreement between NECA and Local 725, the provisions requiring the employer to make contributions to the Welfare and Pension Funds are found in Section 6.03 and 6.04. These sections of the Inside Agreement read, in pertinent part, as follows:

> Section 6.03: The Employer shall pay into the NECA-IBEW Welfare Trust Fund as established by the Amended Agreement and Declaration of Trust executed as of November 21, 1955, the sum of five dollars and fifteen cents ($5.15) per hour worked. Contributions for employees working the second (2nd) or third (3rd) shifts shall be made for eight (8) hours, provided the employee works the complete shift.
>
> [* * *]
>
> The Employer agrees to be bound by the Amended Agreement and Declaration of Trust of the NECA-IBEW Welfare Trust Fund and by any future amendments thereto.
>
> Section 6.04: The Employer agrees to be bound by the Agreement and Declaration of Trust entered into March 14, 1972 establishing the NECA-IBEW Pension Trust Fund and by any amendments to said Trust Agreement. The Employer shall contribute into the NECA-IBEW Pension Trust Fund seven and one-half percent (7.5%) of an employee's gross hourly wage rate for each hour worked, in the preceding month, by all employees engaged in bargaining unit work other than 1st and 2nd period apprentices. Contributions for employees working the second (2nd) or third (3rd) shifts shall be made for eight (8) hours, provided the employee works the complete shift.

(#26, Exh. 14). These two provisions in the 2006-2008 Inside Agreement between Defendant and Local 725, as awarded by the CIR and enforced by the District Court Southern District of Indiana, are substantially similar, with the exception that the Pension Trust Fund contribution rate in the 2006-2008 version of Section 6.04 was increased to eight percent. (#26, Exh. 15).

Similarly, the Residential Agreement, effective June 1, 2006 through May 31, 2008, requires an employer contribute to the Welfare and Pension funds. Those sections read, in pertinent part, as follows:

Section 5.03: The Employer shall pay into the NECA-IBEW Welfare Trust Fund as established by the Amended Agreement and Declaration of Trust executed as of November 21, 1955, the sum of five dollars and fifteen cents ($5.15) per hour worked. Contributions for employees working the second (2nd) or third (3rd) shifts shall be made for eight (8) hours, provided the employee works the complete shift.

[ * * *]

The Employer agrees to be bound by the Amended Agreement and Declaration of Trust of the NECA-IBEW Welfare Trust Fund and by any future amendments thereto.

Section 5.04: The Employer agrees to be bound by the Agreement and Declaration of Trust entered into March 14, 1972 establishing the NECA-IBEW Pension Trust Fund and by any amendments to said Trust Agreement The Employer shall contribute into the NECA-IBEW Pension Trust Fund ten percent (10%) of an employee's gross hourly wage rate for each hour worked, in the preceding month, by all employees engaged in bargaining unit work other than 1st and 2nd period apprentices. Contributions for employees working the second (2nd) or third (3rd) shifts shall be made for eight (8) hours, provided the employee works the complete shift.

(#26, Exh. 6). Thus, Defendant's duties will turn on the definition of the words "employee", "work", or "bargaining unit work". If certain legal exceptions or the undisputed evidence apply to remove the Family Employees from having participated in "work" under Inside Agreement § 6.03 and Residential Agreement § 5.03, or apply to prevent from qualifying as "employees" or from having participated in "bargaining unit work" under Inside Agreement § 6.04 and Residential Agreement § 5.03, Defendant would not be required to contribute for those individuals.

*1. Definitions of "employee"*

While Black's defines an employee as a "person who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance," the nuances of what qualifies an individual as an "employee" in the context of this litigation necessarily go beyond the scope of a

- 19 -

general definition. BLACK'S LAW DICTIONARY (9th ed. 2009). The definition of "employee"

under ERISA is similarly unavailing. 29 U.S.C. § 1002(6); *see Nationwide Mut. Ins. Co. v.*

*Darden*, 503 U.S. 318, 323 (1992). This court therefore proceeds to the language in the

Agreements.

    *i. Collective bargaining agreements*

While the Inside Agreement defines "Employer" in Section 2.01 with great detail, it is

oddly silent on the definition of "employee". Section 4.05 describes classifications of employees

in the bargaining unit as Journeyman Wireman, Foreman, Foreman (Leading), General Foreman,

and Apprentice Wireman, but is vague as to whether this list is an exclusive and complete list of

all the possible certifications that may be treated as employees, or is simply advisory as to the

minimum wage required when an employee belongs to one of those classifications.

Section 3.13 of the Inside Agreement allows, in pertinent part, that

> An employer signatory to a collective bargaining agreement or to a letter of
> assent to an agreement with another IBEW Local Union, who signs an assent
> to this Agreement, may bring up to four bargaining unit employees employed
> in that local Union's jurisdiction into this Local's jurisdiction, and up to two
> bargaining unit employees per job from that Local's jurisdiction to this Local's
> jurisdiction for specialty or service and maintenance work.

The specific use of the term "bargaining unit employee" in the context of specialty or

service and maintenance work, as compared to the use of "employee", without the "bargaining

unit" qualifier as found in Sections 6.03 and 6.04, suggests a classification of "employee" is

intended to be more broadly defined for the purpose of contributions compared to a "bargaining

unit employee", which presumably is intended for the purpose of substantive work. However, the

term "bargaining unit" is not defined anywhere in the Agreements. Therefore, a clear and

unequivocal definition of what qualifies an individual to be an "employee" of Defendant cannot

be found within the four corners of the CBAs. Additionally, however, the CBAs not only

reference both the Pension and Welfare trusts but also bind Defendant to those agreements.

### ii. Welfare Fund

In the Restated Agreement and Declaration of Trust of the NECA-IBEW Welfare Trust

Fund, effective November 21, 1955 (#23, Exh. A), the term Employee is defined. In the Welfare

Trust, Section 1.6 defines the term "Employee" as

> any employee working for an Employer as defined herein, and with respect to
> whose employment an Employer is required to make contributions to the
> Fund.

(#23, Exh. A). This definition is circular for our purposes and is not helpful. However, Section

1.7(f) states that

> [g]enerally, pursuant to the strictures of the Employee Retirement Income
> Security Act, unless otherwise permitted by law, individual owners, sole
> proprietors and partners shall not be considered Employees.

(#23, Exh. A). As for substantive duties, the Welfare Trust Agreement requires, in Section

4.1(a), that

> Each Employer shall make prompt contributions or payments to the Trust
> Fund in such amount and under the terms as are provided for in the applicable
> collective bargaining agreement in effect from time to time between the
> Employer or his bargaining representative and the Union.

(#23, Exh. A). This definition also does not add anything to the court's interpretation as it simply

references the terms of the CBA. But Section 4.1(c) requires that

> Each Employer shall be responsible only for the contributions payable by him
> on account of Employees covered by him, except as may be otherwise
> provided by law.

Further, Section 4.1(e) of the Welfare agreement requires that:

> Employers shall make contributions on behalf of each of its employees
> employed by the Employer in a management, supervisory, or other non-
> bargaining capacity who are also engaged in bargaining unit work.

(#23, Exh. A). While Section 4.1(e) implies that Employers are not required to make contributions on behalf of individuals employed purely in non-bargaining capacity work, it does not explicitly require so. A careful parsing of the section indicates only that employees are required to contribute for non-bargaining-unit employees if they are also engaged in bargaining unit work. It is conspicuously missing an exclusionary phrase (*e.g.*, "employers shall make contributions *only* for those supervisory employees if they are also engaged in bargaining work") or a supplemental clause that explicitly permits employees to avoid making contributions to those non-bargaining-unit employees who do not perform bargaining unit work (*e.g.*, "employers are not required to make contributions to employees in management, supervisory, or other non-bargaining capacity who are not engaged in bargaining unit work."). However, given that the default condition is that an employer is required to make contributions for all employees pursuant to the CBA, and that giving 4.1(e) its literal and unadorned meaning would also add nothing to the agreement, thus making it surplusage, this passage supports an interpretation that employers must contribute on behalf of non-bargaining-work employees *only if* they are *also* engaged in bargaining unit work.

*iii. Pension Fund*

In the NECA-IBEW Pension Benefit Trust Fund Trust Agreement, effective September 1, 1994 (#24), the term Employee is also defined. Section 1.05 of the Pension agreement defines "Employee" as

> A person working under the terms of a Union Agreement with an Association. A person otherwise meeting the definition of employee is not to be excluded because the person has an ownership interest in or a management position with an Employer.

(#24). Again, this definition is circular and does not add to an interpretation of the word. The exception for ownership or management is relevant, as Miller Sr. is the owner of the business. Notably, its coverage of individuals with an ownership interest is contrary to the provision in Section 1.7(f) of the Welfare Fund agreement, as described above.

Finally, Defendant's sole argument in its Response is that 1) the Family Employees are excluded from the IBEW Unit, according to an NLRB definition, and that 2) only the IBEW Unit is bound by the terms of the CBAs. In support of the second assertion, Defendant cites to a footnote in the NLRB order withdrawing its notice of hearing after Defendant withdrew its objections to an election converting its representation status. The footnote, which referenced the election by secret ballot, stated, in whole:

> The appropriate unit as set forth in item 13 of the Stipulated Election Agreement is as follows:
>
> All full-time and regular part-time employees performing electrical work, including all apprentice wiremen, all apprentice residential wiremen, all journeyman residential wiremen, all apprentice installer/technicians, all journeyman wiremen, all journeyman installer/technicians, and all foremen, foremen (leading), and general foremen; BUT EXCLUDING all office clerical employees, all professional employees, all guards and all supervisors as defined in the Act.

(#25, Exh. 7, fn.1). NLRB principles are not relevant to contract interpretation in an ERISA enforcement action. Further, the footnote refers merely to a stipulation regarding who may vote in the conversion election, and Defendant has not presented this court with any evidence that even tends to show that the footnote has anything to do with NLRB unit determination, much less the intent of the contract drafters to include or exclude certain employees when considering an employer's duty to contribute.

*2. Definition of "work"*

- 23 -

Next, this analysis proceeds by examining the definition of the word "work". Section

3.05 of the Inside Agreement indicates, in its entirety, that

> Work covered by and to be performed by employees covered by this
> Agreement, except as otherwise provided for, shall consist of the installation,
> connecting, shifting or repairing of all wiring, either permanent or temporary,
> for light, heat and power, maintenance of pumps, fans, blowers and other
> electrical equipment in new buildings in the course of construction, old
> buildings undergoing alterations, subways or bridges under construction.

(#26, Exh. 3). Similarly, the preamble of the Residential Agreement indicates that

> Work covered by and to be performed by employees under the terms of this
> Agreement shall consist of the installation of electrical systems in residential
> occupancy buildings and apartments up to and including three living stories,
> including repairs, renovation and alteration thereof. Garages and/or other
> outbuildings located within the property lines on which the aforesaid
> residential occupancy buildings are located and which are to be used for
> storage and personal properties of the occupants thereof shall, for the purpose
> of this Agreement, be considered as a part of the building structure.

(#26, Exh. 6). These statements clearly define "work" that is covered by and to be performed by

"employees" as those consisting of duties relating to the installation, connecting, shifting,

repairing, renovation, or alteration of electrical systems or equipment. Because the Inside and

Residential Agreements require that the employer "pay into the NECA-IBEW Welfare Trust

Fund… the sum of five dollars and fifteen cents ($5.15) per hour worked" as well as "contribute

into the NECA-IBEW Pension Trust Fund seven and one-half percent (7.5%) of an employee's

gross hourly wage rate for each hour worked… by all employees engaged in bargaining unit

work," the relevant issue is which, if any, of the Family Employees performed activities or

services that would qualify them as "working".

The Seventh Circuit's recent opinion in *McCleskey v. DLF Const., Inc.* is instructive. 689

F.3d 677 (7th Cir. 2012). The facts in that case are very similar to the ones here. There, an

employee of the defendant was a journeyman cement mason. The employee performed cement-

related work as well as non-cement related work, including painting, installing hardwood floors, and some demolition. The employer-defendant made contributions to a pension fund and a health and welfare fund, pursuant to two CBAs, for the hours that the employee performed for cement-related work. However, the employer did not contribute for the employee's non-cement-related work hours. *Id*. at 678-79. The CBAs required employers to pay into the funds "per hour for each hour worked by employees covered by this Agreement". *McClesky v. DLF Construction*, 09-CV-724 (S.D. Ind. March 9, 2011), *affirmed* 689 F.3d 677. There, the CBA required that all employees who were bargaining unit members were covered by the agreements. 689 F.3d at 680. Accordingly, because the employer was required to contribute for any employee who did at least some bargaining unit work, rather than for those employees who *only* did bargaining unit work, all the hours the employee worked, regardless of whether those hours were for bargaining unit work, qualified as time for which the employer was required to contribute to the funds. *Id*.

Second, the Seventh Circuit directly addressed an asserted exception regarding the word "work". In that case, the defendant argued that its obligations to contribute applied only for work as defined in the CBAs. The court disagreed, holding that "Section 2 of Article III merely describes the Cement Masons Union's trade activities for purposes of inter-union disputes over its jurisdictional claims. This section was not intended to, and does not, define bargaining unit work for purposes of fringe benefit contributions." *McCleskey*, 689 F.3d at 680. Section 2 of Article III in the CBAs in *McCleskey* read, in pertinent part, as follows:

> In the event of a jurisdictional dispute between the Union and any other Union affiliated with the Building and Construction Trades Department, AFL-CIO, the parties hereto agree to comply with the procedural rules and regulations of the National Joint Board for the Settlement of Jurisdictional Disputes.
>
> For the purpose of complying therewith, the following are the jurisdictional claims of the Cement Masons insofar as they are not inconsistent with the decisions and agreements for record as contained in the "Green Book" of the

National Joint Board for the Settlement of Jurisdictional Disputes, and/or any jurisdictional agreement attested by the impartial umpire and signed by O.P. & C.M.I.A., and any other International Union signatory to the National Joint Plan:

(a) All Concrete construction, including foremanship of same, such as buildings, bridges, silos, elevators, smoke stacks, CUIUS and gutters, sidewalks, streets, and roads, alleys and roofs, of mass ·or reinforced concrete slabs and all flat surfaces of cement, rock asphalt, laying and spreading and finishing of all types of bituminous concrete, including all types of asphalt floors and pavements, the operation and control of all types of vacuum mats used in the drying of cement floors ·in preparing same for finish; the operation of power driven floats and troweling machines, operation of machines for cutting joints in floors, slabs, and walks…

[* * *]

*McCleskey*, 689 F.3d 677 (No. 11-1826, docket entry #13, Appendix by Appellant DLF

Construction, page 17-18). No such limiting jurisdictional directive is present in the two CBAs at

bar here. Thus, the holding in *McCleskey* regarding the applicability of the word "work" in the

CBAs is distinguishable from the interpretation at which this court has arrived.

Thus, *McCleskey* stands for two propositions: first, that as long as an employee engages

in some bargaining unit work, he is covered by the terms of the CBA and accordingly the

employer must contribute for all his hours worked, regardless of what tasks he performs; and

second, that unlike in *McCleskey*, the definition of "work" may be applied to the CBAs in their

entirety.

*3. Miller Sr.*

Defendant argues that it is not required to contribute on behalf of Miller Sr. because he is

a supervisor and sole owner, and as such, is excluded from the bargaining unit. Regarding the

first argument, Defendant asserts that a supervisor does not qualify as an employee, supported by

a footnote discussing the voting rights of various employees in the NLRB order withdrawing its

notice of hearing after Defendant withdrew its objections to an election converting its

representation status. As discussed earlier, this court does not consider the NLRB's order to have even persuasive authority, and accordingly, gives this argument no weight. Because the terms of the contract control, rather than a stipulation of voting rights, this argument is not persuasive.

Section 4.1(a) of the Welfare Trust requires an employer to make prompt contributions under the terms of the CBA, but Section 4.1(c) specifically indicates that each employer is responsible only for employees covered by him. Section 1.7(f) states that individual owners and sole proprietors are not considered employees. Throughout this litigation, both Plaintiffs and Defendant have referred to Miller Sr. as the "owner" of the Defendant corporation. (Pls.' Mot. for Summary Judgment ¶¶ 35, 46 (uncontested); Dft.'s Response to Mot. for Summary Judgment ¶ 56; Dep. 24:23-24, 58:17-59:10, 66:8-12). In the Indiana Secretary of State corporate registry, Ernie's Electric Co, Inc. is registered as a for-profit domestic corporation with a "Samuel A Miller" listed as the only two principals, Secretary and President.) The business was incorporated in 1976 with business entity reports filed between 1977 and 1980. In 1989, an application of reinstatement was filed, and entity reports were filed semi-regularly, but not yearly, through 2012. Thus, because a corporation has shareholders, directors, and officers, rather than "owners", Miller Sr. cannot be excepted from contributing under § 1.7(f) because he is neither an individual owner, sole proprietor, nor partner. Although the corporate veil may be pierced in ERISA cases such that an individual owner is treated as the alter ego of a corporation, such a practice has been used as a sword, not a shield. This is especially so given the congressional polices underlying ERISA that favor the enforcement of financial obligations to employee benefit plans. *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 461 (7th Cir. 1991).

Regarding the second argument, Defendant asserts that "an owner cannot at once be deemed an employer and an employee," citing to *Matinchek v. John Alden Life Ins. Co.*, 93 F.3d

96, 101 (3d Cir. 1996). While Defendant cites the language correctly, that case is inapposite. First, *Matinchek* was an action to enforce insurance coverage for a sole business owner and his or her immediate family members under the terms of an employee welfare plan, and therefore fell under the entire purview of ERISA. *Id*. at 97, 101 ("At least five courts of appeal have similarly recognized that ERISA does not govern a "plan" that is merely an insurance policy under which the only beneficiaries are the company's owners."). The present case is about contractual obligations to contribute, with only the cause of action to enforce delinquent contributions afforded by ERISA. Second, even if the terms of ERISA control, "under ERISA, a working owner may have dual status, *i.e.,* he can be an employee entitled to participate in a plan and, at the same time, the employer (or owner or member of the employer) who established the plan." *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 16 (2004).

Oddly, in none of the statement of facts, response to the statement of facts, or reply to the response contained in the briefs, does either party affirmatively state whether Miller Sr. performed work related to installing or maintaining electrical systems. Miller Sr. admits that he was a master electrician and that he does "bidding jobs, billing, collection and the work." (Dep. 7:7-11). "Master electrician" is not one of the classifications in Section 4.05 of the Inside or Residential Agreements. During the deposition, Plaintiffs confirm that Miller Sr. handles labor relations and the payroll, supervises employees, and handles the finances. (Dep. 8:6-9:5). The only mention of non-supervisory and non-management tasks that Miller Sr. performed was when asked whether he "use[s] any equipment in the performing of the work that [he does]", he replied, "[n]ot a whole lot… [m]aybe a lift every--maybe twice a year or something like that." (Dep. 9:6-11). This does not sound like work related to the installation or maintenance of

electrical systems. However, Plaintiffs do not further question Miller Sr. as to what kind of tasks

"the work" entails, and Defendant does not explain. Later, the following colloquy occurred:

> Q [Plaintiffs]: I'm going to read interrogatory No.4. It says, "Identify all the
> work performed by the company during the period from January 1,2005
> through September 30, 2007 for which you believe is work not covered by the
> IBEW 725 collective bargaining agreement which you are or were a party."
> And the answer is "All work performed by those listed in response to
> interrogatory 3." So if I go to interrogatory 3, it's basically you and your
> family?
>
> A [Miller Sr.]: Uh-huh.
>
> Q. So you're saying work that you and your family did for the company isn't
> covered by a contract or you're excluded? [ * * *]
>
> A. I would, I would have to say yes.

(Dep. 59:20-60:15). Miller Sr. also testified that

> I didn't do it to get out of paying anything, if that's what you're saying. It is
> what it is. I wanted to just work, me and my son, as the names of the
> employees dropped off of the register one by one.
>
> [ * * *]
>
> The work wasn't there. The only work we had was just for me and my son,
> and that's what we did.

(Dep. 68:7-24). Here, Miller Sr. indicates that there was a minimal amount of work for him and

his son. "Work" could have qualified as managerial or supervisory tasks, which would not fall

under the requirement of installation or maintenance of electrical systems as required by either

CBA. However, the payroll audits for the Welfare and Pension Trust Funds Agreed-Upon

Procedures Report require auditors verify "through job cost records that hours reported for each

employee were for covered work". Therefore, at least some of the work billed for and accounted

for in the payroll audits are for "covered work" in the Audit Period.

Thus, as discussed above, because Miller Sr. is not excepted from employee status for the purpose of the Welfare fund, and, construing the evidence in the light most favorable to Defendant and drawing all reasonable inferences in favor of Defendant, because contributions are required for all of an employee's worked hours if only some of that employee's hours are covered, this court must come to the conclusion that Defendant is responsible for contributing to both the Pension and Welfare Funds for Miller Sr.

*4. Miller Jr.*

Defendant argues that it is not required to contribute on behalf of Miller Jr. because he was a member of Miller Sr.'s immediate family. For Miller Jr., Defendant also cites to *Matinchek*, arguing that that case stands for the proposition that "an insurance coverage plan covering only a sole business owner and his or her immediate family members cannot qualify as an employee welfare benefit plan covered by ERISA." *Matinchek*, 93 F.3d at 101. Defendant notes that *Matinchek* was cited favorably by the Seventh Circuit in *Int'l Union of Operating Engineers, Local 150 v. Rabine*, 161 F.3d 427 (7th Cir. 1998).

Plaintiffs respond that the language in *Matinchek* was too broad, and that the Third Circuit subsequently clarified its position. The court agrees with Plaintiffs. Despite the language in *Matinchek*, the Third Circuit noted that because the facts there involved an owner and his spouse who were the only co-owners of a business, the broader phrasing was dictum. *Leckey v. Stefano*, 263 F.3d 267, 271 (3d Cir. 2001). In *Leckey*, the court held that regardless of whether the co-owners of a company are spouses or partners, they do not qualify as employees "because 29 C.F.R. § 2510.3-3(c)(2) states that a partner in a partnership and his or her spouse shall not be deemed to be employees with respect to the partnership." *Id.* (editing marks omitted). There, the court held that the step-daughter of a plan participant constituted an employee for the purpose of

- 30 -

ERISA benefits, even though she was also a co-owner. *Id.* at 272. Thus, *Matinchek* may not be used here to exclude Miller Jr. because Miller Jr. is neither a partner nor a spouse of Miller Sr.

Defendant also argues that it was not required to contribute for Miller Jr.'s hours because Miller Jr. was a supervisor pursuant to the footnote in the NLRP order. Further, Miller Jr., was neither considered a member of the IBEW Unit nor was he entitled to vote as one. The same reasoning applies here as it did for Miller Sr. as to why this argument is not valid.

Finally, Defendant admits that Miller Jr. was employed as an electrician and supervisor and does not contest the contents of the payroll audits. Pursuant to *McCleskey*, Miller Jr.'s hours are covered by both the Welfare and Pension trust funds under the terms of the CBAs regardless of whether some of those hours were not for bargaining unit work. Accordingly, because Defendant is required to contribute to the Welfare and Pension funds pursuant to the CBAs for each hour worked, because Miller Jr. does not contest that the hours worked were not for tasks related to electrical systems, and because no other exceptions apply, including his status as a supervisor, this court finds that Defendant is liable for contributing for Miller Jr.

*5. Matthew Miller*

Defendant claims that Matthew did not perform any electrical duties at all. If true, the duties that Matthew Miller performed and logged as hours do not qualify as "work" pursuant to the definition in the CBAs as they were not related to electrical services. In his affidavit, Miller Sr. attests that

> 4. My son, Matthew Miller was employed as a non-electrical employee who performed office work and drove a truck for delivery purposes. Matthew Miller did not perform electrical work, did not perform field work, and was not considered to be a member of the IBEW Unit or entitled to vote as one.
>
> 5. The term "electrician helper" refers to an individual with both specific training and specific job duties. Matthew Miller was neither employed as an

> "electrician helper" at Ernie's, nor did he perform any "electrician helper"
> duties for Ernie's.

(#30, Affidavit of Samuel A. Miller). In his deposition, Miller Sr. also testifies that Matthew

Miller is not an electrician. However, Plaintiffs' Affidavit of Todd Thacker avers otherwise:

> 22. Matthew Miller is an electrician helper which is a position covered by the
> IBEW Local Union 725 bargaining unit.

(#27, Exh. C, Affidavit of Todd Thacker). Electrician helper is not one of the classifications in

Section 4.05 of the Inside or Residential agreements. Further, this court does not understand the

distinction that Plaintiffs have drawn, if any, in arguing on one hand that the NLRB bargaining

unit classification of supervisor does not divest Miller Sr. and Jr. from Defendant's duty to

contribute, but on the other simultaneously argue that the bargaining unit classification of

electrician helper does apply to Matthew Miller.

The parties also disagreed on this issue during the deposition. On direct, Miller Sr. stated

as follows:

> Q. [Plaintiff] And Matthew Miller was a participant in the pension fund?
>
> A. [Miller Sr.] No.
>
> Q. Okay. When did Matthew J. Miller start with Ernie's Electric, Inc.?
>
> A. I don't really know that date right off the top of my head. I don't, I don't
> know. Matthew was never a field worker. Matt, alls he did was deliver
> material. He was merely a handler. That was it. He didn't work on the job.
>
> Q. So was he an electrician helper?
>
> A. No.
>
> Q. What's an electrician helper?
>
> A. An electrician's helper is somebody who actually is on the job, nails boxes,
> drills holes and does stuff like that. What I'm telling you is he handled -- he
> was a material handler.

(Dep. 39:8-40:1).

Plaintiffs' Affidavit of Tari Stower adds to the confusion. Plaintiffs state, in their reply to the statement of facts, that "Sam Miller's sons performed covered work so they are allowed to participate in the Funds…." and cite to the Affidavit of Tari Stower. (#31 ¶ 50). But that affidavit states that "Samuel Miller, Dwayne Miller, Jesse Miller, Samuel Miller Jr. were employees of Ernie's Electric Co., Inc. on or about January 1, 2005 through September 30, 2007 and were participants in Plaintiff's pension and welfare funds." (#23, Exh. A ¶ 10). Given that the two Millers in dispute are listed, that Jesse Miller is Miller Sr.'s brother (and for whom contributions are not disputed), and that Dwayne Miller is not even part of the Miller family, the absence of Matthew Miller from Stower's list of employees with the last name of Miller is inexplicable. (Dep. 37:11-14).

Thus, whether Matthew Miller held the position of "electrician helper" and whether he performed work related to the installation or maintenance of electrical systems is in dispute. In fact, neither party has asserted a definition of the classification "electrician helper". These facts are material because if he did, Defendant would be liable to contribute on his behalf. If he did not, then the amount that Defendant is purported to owe the Funds as calculated by the payroll audit would not be correct. Accordingly, summary judgment must be denied on this allegation.

IT IS THEREFORE ORDERED THAT:

(1) The Motion for Summary Judgment [23] is GRANTED in part as to the Other Employees, Samuel Miller Sr., and Samuel Miller Jr.

(2) The Motion for Summary Judgment [23] is DENIED in part as to all contributions for Matthew Miller.

(3) A status hearing is set on November 29, 2012 at 3:30 pm to discuss scheduling a bench trial on the remaining issues and on damages.

Entered this 15th day of November, 2012

s/MICHAEL P. McCUSKEY

U.S. DISTRICT JUDGE